# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

═══════════════
## NO. 03-05-00565-CV
═══════════════

**CenterPoint Energy Houston Electric, LLC and
Texas Genco, LP, Appellants**

**v.**

**Public Utility Commission of Texas and
City of Houston, Appellees**

═══════════════════════════════════════════════════════════
**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT
NO. GN402478, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING**
═══════════════════════════════════════════════════════════

## O P I N I O N

CenterPoint Energy Houston Electric, LLC and Texas Genco, LP (collectively "CenterPoint"), successors to a former integrated utility serving the Houston area,[1] appeal a district-court judgment that affirmed an order of the Public Utility Commission in a fuel reconciliation

---

[1] CenterPoint Energy Houston Electric, LLC and Texas Genco, LP are successors to the formerly integrated utility that served the Houston area and began the process of unbundling pursuant to the Public Utility Regulatory Act in 2000. CenterPoint is now a transmission and distribution utility and no longer generates or purchases power for resale. Texas Genco is an independent power generation company that is no longer owned by CenterPoint. Other entities that composed the former utility include Houston Lighting & Power Company ("HL&P"), CenterPoint Energy, Inc., and Reliant Energy, Inc.

proceeding under the Public Utility Regulatory Act (PURA).[2] *See* Tex. Util. Code Ann. § 36.203 (West 1998). In its order, the Commission disallowed the recovery of certain fuel expenses because they were not reasonable and necessary. We affirm the judgment.

***The Controversy***

A fuel reconciliation proceeding is the means by which a regulated utility's reasonable and necessary fuel and purchased power expenses are finalized. Because a regulated utility, such as CenterPoint, is not permitted under PURA to automatically pass through to ratepayers its fuel and purchased power costs, it must reconcile its fuel revenues and expenses to avoid over- or under-recovery of the costs set by the Commission in the form of a fixed fuel factor.

This appeal concerns CenterPoint's request for recovery of purchased power costs under a Joint Operating Agreement ("JOA") that CenterPoint entered into with City Public Service of San Antonio ("CPS"), San Antonio's municipally owned utility, arising out of litigation and then settlement between the parties over the management of the South Texas Nuclear Project ("STP"). CenterPoint urges that the Joint Operating Agreement enabled CenterPoint and CPS to reduce their costs and that CenterPoint carried its burden in the proceedings to demonstrate that its fuel expenses during the reconciliation period were reasonable and necessary. The Commission and intervenor City of Houston contend that (i) the purpose of the Joint Operating Agreement was to settle litigation over CenterPoint's imprudent mismanagement of the South Texas Nuclear Project, (ii) the benefits

---

[2] Public Utility Regulatory Act (PURA), Tex. Util. Code Ann. §§ 11.001-66.017 (West 1998 & Supp. 2005).

2

of the Joint Operating Agreement are overstated, and (iii) these costs are not recoverable through CenterPoint's fuel factor and should be disallowed.

*The Nature of a Fuel Reconciliation Proceeding*

Instead of allowing a regulated utility to pass its actual fuel costs through to its customers, the Commission designs a rate for the utility that takes into account projected fuel costs in the form of a fixed "fuel factor." Tex. Util. Code Ann. § 36.203. The Commission periodically adjusts this factor and reconciles fuel costs the utility charged using the factor against fuel costs the utility actually incurred. *See id*. Section 36.203 provides for the timely adjustment of a utility's fuel factor, with or without a hearing, and the reconciliation of a utility's fuel costs. *Id*. In a fuel reconciliation proceeding, the utility carries the burden of proving that its eligible fuel expenses during the reconciliation period were "reasonable and necessary expenses" to provide reliable service to its customers. 16 Tex. Admin. Code § 25.236(d)(1)(A) (2004).[3] The scope of the proceeding

---

[3] The Rule provides for the following burden of proof and scope of proceeding in a fuel reconciliation proceeding:

(1) In a proceeding to reconcile fuel factor revenues and expenses, an electric utility has the burden of showing that:

(A) its eligible fuel expenses during the reconciliation period were reasonable and necessary expenses incurred to provide reliable electric service to retail customers;

(B) if its eligible fuel expenses for the reconciliation period included an item or class of items supplied by an affiliate of the electric utility, the prices charged by the supplying affiliate to the electric utility were reasonable and necessary and no higher than the prices charged by the supplying affiliate to its other affiliates or divisions or to unaffiliated persons or corporations for the same item or class of items; and

3

includes "any issue" related to determining the reasonableness of the electric utility's fuel expenses during the reconciliation period. *Id*. § 25.236(d)(2).

This is CenterPoint's final fuel reconciliation, and the final fuel balance will be included in its true-up proceeding. *See* Tex. Util. Code Ann. § 39.202(c) (West Supp. 2005). The final balance from the true-up proceeding will be applied to the rates charged by CenterPoint as the transmission and distribution provider affiliated with the former integrated utility. *Id*. § 39.262 (West Supp. 2005).

## FACTUAL AND PROCEDURAL BACKGROUND

On July 1, 2002, CenterPoint filed a petition to reconcile its revenues collected under the fuel factors with the actual fuel and purchased power costs incurred for the period August 1, 1997, through January 20, 2002. The Commission referred the application to the State Office of Administrative Hearings for a contested case hearing before an administrative law judge. Several parties, including the City of Houston, intervened in the proceeding, challenging CenterPoint's claimed expenses. The parties filed a stipulation resolving certain of the claimed expenses, leaving in dispute a total of $202 million over four issues, which were reserved for a hearing.

---

(C) it has properly accounted for the amount of fuel-related revenues collected pursuant to the fuel factor during the reconciliation period.

(2) The scope of a fuel reconciliation proceeding includes any issue related to determining the reasonableness of the electric utility's fuel expenses during the reconciliation period and whether the electric utility has over- or under-recovered its reasonable fuel expenses.

16 Tex. Admin. Code § 25.236(d)(1)-(2).

4

These remaining expenses related to the recovery of CenterPoint's purchased power costs under the JOA that CenterPoint had entered into with CPS in 1996.

*The Joint Operating Agreement*

The terms and the allocation of savings arising from the joint operations of CenterPoint and CPS are at the core of this dispute. The JOA arose out of CPS's claim against HL&P over its operation of the STP in which CPS had an interest. The agreement between CPS and HL&P was executed on July 1, 1996, and resulted in CenterPoint as successor maintaining joint operations with CPS. The JOA provided for the joint operation of the two utilities' electrical generating systems in order to serve their combined load as a single service area. Under this joint dispatch arrangement, excess capacity from one utility could be used to serve the other utility's customers.

At the end of each month, CPS and CenterPoint would calculate the net flow of energy from one utility to the other. Compensation for energy used was to have two separate components: the Production Cost Adjustment ("PCA") and a benefit-sharing payment. The PCA was created to reimburse the party providing the energy for its costs of producing the electricity. The benefit-sharing payment allocated a pre-determined share of the benefits of joint operation between the parties.

Under the terms of the JOA, CPS and CenterPoint were required to calculate their individual cost of operating in the joint system and compare the joint system costs to the costs that would have occurred had the two parties operated separately, thus determining the savings arising from their joint operations. Joint system costs were calculated on the basis of a study designated

5

"Study J"; stand-alone costs were calculated on the basis of "Study S."[4]  The JOA defined the total joint operation benefit as the difference between the parties' actual costs under the joint operations and their stand-alone costs.  Under this negotiated sharing arrangement, CPS would receive 90% of the calculated total benefit, while CenterPoint received 10%.  The 90/10 allocation would continue until CPS received $150 million in benefit payments.  CenterPoint would avoid the payment of $150 million in settlement payments if the JOA produced savings in that amount for CPS.[5]  In January 2000, the parties modified the benefit split for short-term transactions from 90/10 to 50/50.

At the hearing, CenterPoint contended that the JOA provided it and CPS with fuel savings through the combined economic dispatch of all the generating units owned and operated by the two parties.  Carla J. Mitcham, then President of the Texas Region for Reliant Resources, Inc., a majority-owned subsidiary of Reliant Energy, Inc., testified:

> Dispatching the systems jointly results in operational efficiencies and economies of scale, allowing the parties to meet their respective obligations at a lower fuel cost than would have been realized had they dispatched their systems independently.  The

---

[4]  Study S included third-party transactions undertaken individually by either party, with the party consummating the transaction retaining all the benefit of the transaction.

[5]  By the agreement, CenterPoint guaranteed to CPS "minimum annual payments of $10 million and a minimum in cumulative payments of $150 million for CPS's ninety percent share of the benefits" of the agreement.  The JOA provided for its term to extend for a term of ten years "provided, however, in the event CPS has not received at least $150 million, made up of payments for benefits of joint operation . . . then in that event joint operation will be continued. . . ."  The agreement then provided, "If CPS receives a cumulative benefit of $150 million from joint operation prior to July 1, 2006, this Agreement shall remain in full force and effect, without any change in the operating practices, procedures and understandings, for the remainder of the ten-year term, in order to enable the Parties to continue to receive benefits from joint operation on the basis provided for in this Agreement."  If CenterPoint violated the agreement by selling its facilities or assets so as to impair CPS's receipt of minimum annual and end-of-term payments, CenterPoint became immediately liable for the $150 million minimum payment.

6

resultant savings in fuel costs are shared by CPS and [CenterPoint]. For the reconciliation period, [CenterPoint]'s customers have realized a savings of $31,415,272 due to the JOA.

Mitcham explained that savings are achieved through the joint dispatch process because CenterPoint "commits and dispatches the most economical units from both parties' available resources to meet the joint obligations of the two systems." By jointly dispatching the two systems, both companies are able to achieve savings in fuel and related costs. Illustrating the economic theory underlying the joint operation of the two utility systems, she described the numerous mechanisms for achieving cost savings through the JOA:

> [T]he most significant savings are realized through the increased utilization of CPS's coal-fired units. As a general rule, coal-fired units, due to their lower fuel price, have a much lower marginal production cost than gas-fired units. For example, if there are two units with identical efficiency, yet one is burning coal at a price of $1.50/MMbtu and the other is burning natural gas at $3.24/MMbtu, then the marginal cost of the gas-fired generation is more than twice as much as the coal-fired generation. Typical values for this example would show the coal-fired marginal cost to be $15.00/MWH and the gas-fired marginal cost to be $32.50/MWH. During certain low load conditions, such as the middle of the night or during the more moderate weather months, CPS has an excess of coal-fired generation above their load obligations. During the CPS low load periods, [CenterPoint]'s load obligations are typically high enough that the marginal cost for [CenterPoint]'s generation portfolio is still determined by a gas-fired unit. Using the previous marginal cost values from above, the most economical and efficient decision is to transfer the $15.00/MWH power from San Antonio to Houston and not generate the $32.50/MWH power. Indeed, this is exactly what happens in the Economic Dispatch process. The resultant savings in this example of $17.50/MWH ($32.50/MWH - $15.00/MWH) for every coal-generated MWH transferred from San Antonio to [CenterPoint] is shared by the two parties.

Under the energy planning process of the JOA, a computerized program modeling the HL&P and CPS systems operated on an hourly basis to determine and select the most economical mix of

7

generating units to serve the load requirements of the companies. CenterPoint demonstrated that both companies saved money because they had the ability to utilize power from the other's generation facilities. When CPS was not utilizing its coal plants at full capacity, CenterPoint could and did purchase electricity from CPS's coal plants rather than running its own gas-fired plants.

Mitcham explained that savings were achieved through the JOA in other ways. From August 1, 1997, to July 30, 2001, the rules and protocols of the Electric Reliability Council of Texas (ERCOT) allowed CPS and CenterPoint as members to reduce their total responsive reserve obligations by dispatching their respective control areas as one.[6] For this portion of the fuel reconciliation period then, dispatching jointly and sharing responsive reserve obligations saved CenterPoint's customers over $31 million of fuel costs.

By the agreement, the parties agreed to "operate their respective electrical generating systems jointly as a single control area in a manner that preserves the autonomy of the individual utilities to serve native load while achieving savings in fuel and related costs which will benefit the customers of both systems." The parties agreed to take no action that would frustrate the purposes

---

[6] Because power is moved throughout the grid, to ensure reliability of the entire ERCOT system, ERCOT requires connected utilities to maintain what is called "responsive" or "spinning" reserve of generating capacity that can quickly provide power in response to a system disturbance. To do this, utilities must have a certain amount of generating capacity up and running or "spinning" but not actually serving customer load, thus maintaining a reserve.

of the agreement, provided, however, that they were not restricted "from responding to external forces or situations beyond [their] reasonable control, such as the requirements of [their] native load or regulatory changes, in a commercially reasonable manner," giving due consideration to the purposes and benefits of joint operation.

The JOA also allowed CPS and CenterPoint to buy and sell power with third parties and to use the jointly operated system to serve those transactions, which were categorized as either "short-term" or "long-term." Short-term transactions were those entered into at or near the actual time of the purchase or sale of power. Long-term transactions were those entered into with more advance planning and often covered purchases over an extended period of time. Margins from short-term transactions were shared by CPS and CenterPoint under the JOA, while margins from long-term transactions were kept by the party making the purchase or sale. The different treatment was based on the assumption that short-term transactions were economical only because of the lower cost of joint operations; otherwise, a party would have entered into the transaction in advance, based on its own costs, and captured the entire benefit. The short-term transactions were originally subject to the 90/10 savings split. Effective January 2000, the parties agreed to share equally the profits or losses from short-term transactions without regard to whether the $150 million in savings had been met.

CenterPoint incurred, and sought to recover, $480 million in costs and benefits it paid CPS during the reconciliation period under the JOA. This amounted to approximately $35.70/MWh. Of the $480 million, $320 million represented CPS's fuel expenses and operation and maintenance expenses for producing the power sold to CenterPoint. The remaining $160 million represented

9

CPS's 90% share of the $191 million in savings that had been achieved as a result of the joint operations pursuant to JOA calculations.

CenterPoint purchased power from approximately ninety different entities during the fuel reconciliation period. Less than half of its power was purchased from CPS. The average price per megawatt hour for all CenterPoint's purchased power was $35.20. Although the City did not challenge as excessive the $35.70/MWh of the power purchased from CPS, it questioned the savings claimed by CenterPoint through the JOA's joint dispatch process.

Because the JOA was the product of a settlement of claims made by CPS against HL&P regarding its management of the construction of the STP, the City urges that "the true purpose of the JOA was to settle litigation over CenterPoint's imprudent management of [STP]" and to fund its settlement with non-recoverable expenses cloaked as fuel expenses. The City assumes that any benefit to the utility from the JOA necessarily comes at the expense of its ratepayers. The City asserts that CenterPoint should have negotiated and received under the JOA more than 10% of the savings, arguing that the inequitable split was the result of CenterPoint's use of the JOA to settle its litigation with CPS. Accordingly, the City urged that the savings recognized under the JOA should be reduced.

After the hearing, the ALJ issued a proposal for decision that recommended disallowance of $67.1 million of the $160 million that CenterPoint had paid to CPS as CPS's share of JOA savings. The proposed disallowance was based on (i) a change and recalculation of the 90/10 split required under the JOA to a 67/33 split of the savings and (ii) a $46.8 million reduction in other savings recognized under the JOA.

10

*The Commission's Decision*

The Commission issued a final order accepting this portion of the ALJ's proposal for decision, finding that CenterPoint failed to prove that $67.1 million of its claimed expenses were prudent and that it should not be recovered as reasonable and necessary fuel expense. Although the Commission made no findings that the negotiated savings split was caused or influenced by the STP settlement, the Commission found that the parties to the JOA overstated the agreement's actual benefits and that CenterPoint paid more than it reasonably should have through the benefit-sharing payments.

The $67.1 million disallowance resulted from three adjustments to the benefits CPS and CenterPoint had estimated under the JOA. First, the Commission found that the 90/10 split of the relative share of the benefits was unfairly disproportionate and therefore flawed. It disregarded the JOA allocation and reallocated the split to a 67/33 basis, with 67% allocated to CPS and 33% to CenterPoint. This change in the split affected only the portion of the savings that, under the JOA, were shared 90/10, leaving unaffected the equal split of short-term transactions that began on January 1, 2000.

The other two adjustments of the $67.1 million concerned the total amount of joint benefits and reduced the JOA savings by $46.8 million. The $46.8 million deduction consisted of two parts: a $30.6 million deduction and a $16.2 million deduction. With respect to the $30.6 million, the Commission found that the JOA overstated the joint benefits attributed to short-term sales. This figure was based on estimated benefits of short-term energy transactions that the JOA required to be treated as joint, shared benefits. In finding of fact no. 82, the Commission determined

11

that it was "reasonable" to adjust CenterPoint's benefit calculation, treating these transactions as stand-alone savings rather than as savings arising from the JOA "to reflect that benefits of short-term energy transactions . . . were erroneously excluded" from Study S.

The third adjustment relating to the total amount of joint benefits was a $16.2 million deduction based on the finding that at certain points in time the costs of block-power purchases from the ERCOT market were lower than the costs of operating CenterPoint's own gas-fired plants. Thus, the Commission found that CPS and CenterPoint overestimated their Study S costs because their calculations ignored the "probability" that they would have purchased energy in the ERCOT wholesale market under a stand-alone operation: finding of fact no. 80 stated, "Without the JOA, CenterPoint had opportunities to purchase economy energy from other suppliers within ERCOT."

**ANALYSIS**

By three issues, CenterPoint urges that the Commission acted arbitrarily and capriciously and without supporting substantial evidence with regard to three aspects of the JOA: (i) the Commission's disregard of the negotiated 90/10 split of the JOA and its reallocation to a 67/33 split; (ii) the Commission's refusal to recognize $30.6 million of savings under the JOA because the agreement included short-term transactions in joint savings; and (iii) the Commission's refusal to recognize $16.2 million of the savings under the JOA by finding that CenterPoint should have calculated its stand-alone costs on the basis of block-power purchases from the ERCOT market whenever those purchases were less than the costs of running CenterPoint's own gas-fired plants.

12

*Standard of Review*

This case turns on our application of the standard of review in an administrative appeal governed by section 2001.74 of the Texas Government Code. *See* Tex. Gov't Code Ann. § 2001.174 (West 2000). We first inquire into the nature of the proceeding and the applicable burden of proof.

CenterPoint seeks to reverse findings and conclusions made by the Commission relating to one of its core functions: the assessment of the reasonableness of a utility's claimed expenses. A utility is entitled to recover from its ratepayers those fuel and purchased power expenses that are "reasonable and necessary expenses incurred to provide reliable electric service to retail customers." 16 Tex. Admin. Code § 25.236(d)(1)(A); *see* Tex. Util. Code Ann. § 36.051 (West 1998)[7]; *see also Cities for Fair Util. Rates v. Public Util. Comm'n*, 924 S.W.2d 933, 935 (Tex. 1996). The parties agree that a utility seeking to pass fuel expenses to ratepayers bears the burden of proving the reasonableness of those expenses. 16 Tex. Admin. Code § 25.236(d)(1)(A). The Commission contends, and we agree, that in filing its petition to reconcile its fuel-related revenues and expenses, CenterPoint assumed the obligation of demonstrating the prudence of expenses incurred. The scope of the proceeding below allows consideration of "*any issue* related to determining the reasonableness of the electric utility's fuel expenses during the reconciliation period." *Id*. § 25.236(d)(2) (emphasis added).

---

[7] PURA provides: "In establishing an electric utility's rates, the regulatory authority shall establish the utility's overall revenues at an amount that will permit the utility a reasonable opportunity to earn a reasonable return on the utility's invested capital used and useful in providing service to the public in excess of the utility's reasonable and necessary operating expenses." Tex. Util. Code Ann. § 36.051.

13

CenterPoint has challenged the Commission's decision as violative of the governing statute and rules, as arbitrary and capricious, and as not reasonably supported by substantial evidence. Tex. Gov't Code Ann. § 2001.174(2)(A), (D), (E), (F). Although a decision not supported by substantial evidence may be deemed to be arbitrary and capricious, a decision may be supported by substantial evidence and yet still be arbitrary and capricious. *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994); *Starr County v. Starr Indus. Servs., Inc.*, 584 S.W.2d 352, 355 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.).

Under the substantial evidence rule, we give significant deference to the agency in its field of expertise. *Railroad Comm'n of Texas v. Torch Operating Co.*, 912 S.W.2d 790, 792 (Tex. 1995). We presume that the agency's findings, inferences, conclusions, and decisions are supported by substantial evidence and the agency order is valid. *Texas Health Facilities Comm'n v. Charter Med.-Dallas, Inc.*, 665 S.W.2d 446, 453 (Tex. 1984); *Southwestern Pub. Serv. v. Public Util. Comm'n*, 962 S.W.2d 207, 215 (Tex. App.—Austin 1998, pet. denied). In conducting a substantial evidence review, we must evaluate the whole record and determine whether the evidence as a whole, taking into account both the supporting and detracting evidence, is such that reasonable minds could have reached the conclusion the agency must have reached in order to take the disputed action. *Texas State Bd. of Dental Exam'rs v. Sizemore*, 759 S.W.2d 114, 116 (Tex. 1988). We afford the agency's expertise substantial deference in interpreting the facts, and we may not substitute our judgment for that of the agency on the weight of the evidence on questions committed to agency discretion. Tex. Gov't Code Ann. § 2001.174; *Cities of Abilene, San Angelo, & Vernon v. Public Util. Comm'n*, 146 S.W.3d 742, 748 (Tex. App.—Austin 2004, no pet.); *City of El Paso*

14

*v. Public Util. Comm'n*, 916 S.W.2d 515, 522 (Tex. App.—Austin 1995), *appeal dism'd by agr.*, 1996 Tex. App. LEXIS 1010 (Tex. App.—Austin Mar. 13, 1996) (Commission has broad discretion to determine recovery of expenses in ratemaking proceeding); *Southern Union Gas Co. v. Railroad Comm'n*, 692 S.W.2d 137, 141-42 (Tex. App.—Austin 1985, writ ref'd n.r.e.).

CenterPoint also urges that the agency decision should be reversed because it is arbitrary and capricious. An agency decision may be found arbitrary and capricious if it is based on legally irrelevant factors or if legally relevant factors were not considered. *City of El Paso v. Public Util. Comm'n*, 883 S.W.2d 179, 184 (Tex. 1994); *Consumers Water, Inc. v. Public Util. Comm'n*, 774 S.W.2d 719, 721 (Tex. App.—Austin 1989, no writ). So long as there is a rational connection between the facts found and the agency's decision, we may not overturn the agency's action as arbitrary or capricious.

But the agency's discretion is not unbridled, and its conclusions must be drawn from the facts. Section 2001.174 speaks of the four different ways in which an agency finding, inference, conclusion, or decision may require reversal: the relevant action may be arbitrary, capricious, characterized by abuse of discretion, or characterized by a clearly unwarranted exercise of discretion. Tex. Gov't Code Ann § 2001.174(F). We reverse only when we are able to conclude from the record as a whole that the agency did not base its finding or conclusion on a consideration of the factors implicated in the case by applicable law or, in the alternative, that the agency did consider the relevant factors but its choice was a clear error of judgment.

The existence of the JOA does not relieve CenterPoint of its burden of demonstrating that its fuel and purchased power expenses were reasonable and necessary. Nor does it augment this

15

burden. The limited nature of our inquiry underscores the burden to be borne by the utility and the latitude in implementation and interpretation by the agency that the legislature intended in a fuel reconciliation proceeding. This latitude, however, does not relieve us of our role in the review process to ensure that the agency take the hard look—lest the deferential review required of us insulates the Commission from judicial review.

### *Reallocation of JOA 90/10 Split*

CenterPoint urges that the Commission acted illegally, arbitrarily and capriciously or without substantial evidence in disallowing amounts it paid to CPS through the 90/10 JOA sharing scheme because the agreement resulted in savings to ratepayers and therefore the expenses were reasonable as a matter of law. The Commission responds that the evidence reflects no real savings and fails to provide any basis for such a disproportionate sharing of benefits. The Commission argues that it disallowed those payments that exceeded CPS's reasonable share of the benefits of joint operation and then disregarded the JOA's savings allocation, adjusting the benefit split to 67/33.

We may not ignore the elephant in the room: the controversy concerning the 90/10 split is grounded in the origins of the JOA. The Commission argues that the 90/10 split is "inherently suspect" because the JOA was conceived for the purpose of settling the existing litigation between CPS and CenterPoint over the STP. The Commission acknowledges that there is no finding to this effect, but that this fact is "beyond dispute." The Commission urges that the evidence reflects no real savings and "shows that the *primary purpose* for the *lopsided division* under the JOA was

16

not to save ratepayers money, but to settle existing litigation between CPS and CenterPoint." (Emphasis added).

CenterPoint urges that a contract that results in comparative savings of this amount to ratepayers is prudent as a matter of law, particularly when the utility had no obligation to enter into a contract of that type. It urges that it prudently negotiated and administered its contracts. CenterPoint contends that the Commission's "fine-tuning" is inconsistent with its "limited role" in a fuel reconciliation proceeding, and that the proceeding allows only a "narrow inquiry" to adjust the fuel factor for the "anomalies resulting from actual, fluctuating fuel prices" that occur. *See GTE S.W., Inc. v. Public Util. Comm'n*, 978 S.W.2d 161, 168 (Tex. App.—Austin 1998, pet. denied) (Powers, J., dissenting) (contrasting fuel-reconciliation proceedings with rate cases).

The ALJ characterized it thus:

> City of Houston contends, and CenterPoint does not necessarily dispute, that it entered into the JOA to settle litigation claims by CPS against [CenterPoint] for mismanagement of the construction and operation of the South Texas Nuclear Project in the 1980's and early 1990's. City of Houston maintains that it is improper for [CenterPoint] to recover the payments because it requires that ratepayers be required to pay for litigation settlement costs related to HL&P's mismanagement of STP, and the lack of verification of the costs and benefits underlying these payments.

The Commission found that CenterPoint failed to justify amounts paid to CPS under the "disproportionate 90/10 sharing scheme." In findings of fact, the Commission found that (i) "[t]he 90/10 benefit split was based on the expectation that most of the benefits of the joint dispatch would come from dispatching CPS's coal units," (ii) of the $191 million of benefits during the reconciliation period, only $109.7 million—or 57%—could be attributed to CPS's coal generation,

17

(iii) CenterPoint "relied too heavily on the use of CPS's excess coal-fired energy in agreeing to the 90/10 benefit split," and (iv) because the 90/10 split overwhelmingly benefitted CPS, it would have been reasonable to track the source of the benefits on a regular basis to verify the accuracy of the split and that its inaccuracy should have been apparent from the beginning because it was based on an incorrect assumption, i.e., the exclusion of short-term energy transactions. The Commission found that CenterPoint was only justified in paying CPS 67% of the total benefit.

CenterPoint acknowledges that the JOA arises as a result of litigation between CenterPoint and CPS. In response to a request for information concerning the circumstances that gave rise to the JOA, Carla Mitcham stated:

> As mentioned in [a prior response], the JOA was entered into as part of an agreement by HL&P and City Public Service Board (CPS) to settle certain claims brought by CPS against HL&P related to the South Texas Project. By jointly dispatching the two systems, both CPS and HL&P can achieve savings in fuel and related costs for the benefit of customers on both systems. The JOA provides significant savings primarily through the increased utilization of CPS's coal-fired units. . . . [B]y dispatching the systems jointly, the JOA provided savings to HL&P's ratepayers, while also creating sufficient benefit for CPS to permit settlement and avoid the risks of costly and protracted litigation.

CenterPoint urges and the Commission found that the JOA provided CenterPoint and CPS with fuel savings through the combined economic dispatch of the generating units owned and operated by CenterPoint and CPS. Because the agreement brought undisputed savings to ratepayers, CenterPoint urges that it was a reasonable contract as a matter of law, and the expenses incurred under it were reasonable as well. The Commission responds that when CenterPoint agreed to the JOA, it consequently assumed the obligation of demonstrating the prudence of all expenses under

18

the agreement and failed to do so. Because CenterPoint was engaging in an unconventional purchase of power, and the price it would ultimately pay was not based on a typical dollars-for-megawatt-hours exchange, the Commission suggests that this series of complex calculations allowed CenterPoint to disproportionately share benefits from the combined operations. CenterPoint's application to reconcile its expenses thus required the Commission to review the expenses, "including the expenses incurred each month under the JOA." The Commission urges that whether the utility has met the burden of proving the reasonableness of its expenses is a matter within the Commission's discretion. *See* Tex. Util. Code Ann. § 36.051 (authorizing the Commission to establish rates that cover a utility's "reasonable and necessary" operating expenses.)

We first address the role of the JOA in this proceeding. We agree with the Commission's assertion that CenterPoint's expenses are not shielded from scrutiny because they were incurred under a contract. But neither shall the expenses and consequent savings be subjected to heightened scrutiny because they were incurred in a contract arising out of a settlement agreement between the parties. Indeed, the existence of the agreement is a neutral fact that does not relieve CenterPoint from its obligation to demonstrate that its expenses were reasonable and necessary and to account for those expenses. Nor does it allow the Commission to disregard a prudently negotiated and administered contract in which reasonable and necessary expenses were incurred.

Mitcham testified that CenterPoint's fuel expenses were reasonable and necessary expenses and that its contract negotiations produced the lowest cost of fuel to CenterPoint's ratepayers. She explained how "dispatching the systems jointly results in operational efficiencies and economies of scale, allowing the parties to meet their respective obligations at a lower fuel cost

19

than would have been realized had they dispatched their systems independently." Mitcham testified that the JOA did not affect the manner in which CenterPoint performed its Energy Planning Process or operated its system:

> The JOA has served to enhance [CenterPoint's] ability to reduce fuel expenses for its customers. The integration of the two systems into a joint dispatch arrangement creates an opportunity for both systems to maximize efficiency, thus reducing fuel costs. The JOA is essentially an automated sales and purchase arrangement between the two companies, although neither is actually obligated to sell or purchase energy from the other. The Energy Planning Process and EMACS includes both CPS's and [CenterPoint's] system demand and generating resources, and dispatch is governed by the economics of the joint electrical systems. The increased efficiencies in operation attained through the JOA could not be realized by the two parties operating separately.

She testified that, for the fuel reconciliation period, dispatching jointly and sharing responsive reserve obligations saved CenterPoint's ratepayers over $31 million in fuel costs.

She also testified that the JOA was modified to account for operational experience and a change in methodology for sharing the benefits of third party transactions. Although section 5.3 of the JOA provided that the benefit-sharing ratio would change from 90/10 to 50/50 once CPS received benefit payments totaling $200 million, the parties agreed to modify the agreement in January 2000 due to concerns raised in previous fuel reconciliation proceedings. Because of these concerns regarding the 90/10 split, CenterPoint and CPS agreed to modify the benefit sharing for third-party marketing transactions. The benefit sharing remained at the contractually agreed upon ratio of 90/10 for benefits realized from dispatching the systems jointly, "primarily because the bulk of the benefits from the JOA are due to CPS's excess coal generation." The parties agreed to alter

20

the benefit sharing of third-party short-term marketing transactions on a 50/50 basis effective January 1, 2000.

Thus, effective January 1, 2000, the benefit-sharing for third-party transactions was recalibrated: the benefit realized by dispatching each party's generation portfolio in a joint manner while meeting their combined obligations continued to be shared on a 90/10 ratio; the benefit realized from each party's third-party marketing transactions was shared on a 50/50 ratio.

The Commission's findings rest on the testimony of Scott Norwood, an electrical engineer with experience in the electric utility industry, who testified on behalf of intervenor City of Houston. Norwood testified that the JOA "appears to have been devised by HL&P as a means to have ratepayers fund a $150 million guaranteed settlement payment to CPS in order to resolve claims related to [CenterPoint's] mismanagement of the construction and operations of STP." Norwood concluded that the 90/10 division was "inherently suspect" because of its origin in litigation and that CenterPoint "likely would not have been able to recover these litigation settlement costs through rates, and particularly not through the fuel reconciliation process." He characterized the benefit calculations as unverified, "fundamentally flawed," and "significantly overstated." He testified:

> The JOA appears to have been devised by HL&P as a means to recover STP litigation settlement costs that otherwise would not have been recoverable from ratepayers in light of the nature of the claim underlying these costs and the fact that the Commission has previously disallowed a significant amount of HL&P's share of such costs. The benefits of the JOA are estimated by HL&P using a complex

21

modeling process that has not been approved by the Commission. [CenterPoint] should have sought approval of this transaction before entering into the JOA.[8]

Norwood urged the Commission to address the "impropriety of charging retail customers for costs to settle claims related to HL&P's past mismanagement of the construction and operation of STP . . . ." Because of the "impropriety of asking ratepayers to pay for litigation settlement costs related to HL&P's mismanagement of STP as eligible fuel, and the lack of verification of costs and benefits underlying these payments," Norwood recommended that a 67/33 benefit-sharing ratio, with 67% to CPS, would be more equitable.

In response to a request for clarification of testimony on the issue of the 90/10 split and Mitcham's testimony at the hearing that only 57% of the JOA benefits were actually derived by dispatching CPS's coal units, CenterPoint responded, "At the time [CenterPoint] entered the JOA . . ., [it] reasonably believed that a 90/10 split of JOA savings would properly reflect the anticipated contribution of the CPS coal units." CenterPoint acknowledged that an "after-the-fact estimate" showed that CPS coal units accounted for 57% of the total JOA benefits, but that the decision was reasonable when made.

---

[8] That CenterPoint failed to obtain advance approval of the JOA from the Commission is not before us. Norwood asserted that CenterPoint was required to report the transaction pursuant to PURA. *See* Tex. Util. Code Ann. § 14.101 (West Supp. 2005). But section 14.101 applies to mergers and acquisitions of plants and does not apply to the JOA. *See id.* Moreover, the Commission's order contains no findings regarding advance approval, and its decision cannot therefore be upheld on this basis. *See Sensitive Care, Inc. v. Texas Dep't of Human Servs.*, 926 S.W.2d 823, 829 (Tex. App.—Austin 1996, no writ) ("[A] reviewing court is forbidden to uphold an agency's final decision based upon *one* conclusion of law when the agency rested its decision upon a *different* conclusion of law stated in its final order.") In any event, CenterPoint did submit the JOA to the Commission in a prior fuel reconciliation, but the Commission did not review it because that proceeding was settled.

There is no suggestion that CenterPoint sought to conceal the origin of the agreement. The agreement itself states that it is entered into "pursuant to the settlement agreement between the parties." That the JOA originated as a means of settling a lawsuit between the contracting parties does not alone make it suspect, or render its terms unreasonable.

CenterPoint, on the other hand, argues that a contract that results in savings to ratepayers is prudent as a matter of law, "particularly when the utility had no obligation to enter into a contract of that type." We do not agree that the very existence of savings renders expenses reasonable and necessary. As CenterPoint asserts in its reply brief, "Had there been *no* savings but merely a reasonable price for power purchased from CPS, CenterPoint would have been entitled to recover these expenses as reasonable and necessary." The issue, then, is whether the fuel expenses were reasonable and necessary and whether CenterPoint carried its burden.

It is undisputed that if there had been no JOA at all, the costs to CenterPoint would have been higher. However, a contract that results in some savings when additional savings were available may not be prudent. The Commission's decision to reallocate the sharing benefit was based on its conclusion that a 67/33 split was reasonable. CenterPoint urges that there is no evidence that CPS would have agreed to terms more favorable than the JOA. Nor is there evidence that CenterPoint could have—or should have—negotiated a similar agreement with some other utility. The JOA is a binding agreement that CenterPoint entered into with an unaffiliated third party.

Prudence does not contemplate the acceptability of a single manner of conducting business or the reasonableness of a single price for fuel. Prudence has two components relevant here: (i) judgment in selecting from a range of reasonable options and (ii) a timing element. It

simply cannot be—and we do not understand the Commission to argue—that CenterPoint has no latitude in exercising its business judgment along a continuum of acceptable choices. Just as this Court may not substitute its judgment for that of the agency, the scope of review cabins the discretion of the agency itself to the range of "reasonable and necessary" choices—not a single decision or even the most reasonable one.

Likewise, judgment is not exercised in a vacuum, but in context. The existence of the contract does not eliminate the reasonableness requirement but simply makes the analysis more complex. It would place an unprecedented burden on CenterPoint to show that it could not have negotiated a better deal. There is no evidence in the record that CPS would have agreed to anything other than the terms of the JOA. To rely solely on the wisdom of hindsight renders the analysis necessarily speculative. Because the reconciliation process is necessarily backward-looking, however, CenterPoint is not relieved of its obligation to carry its burden of establishing reasonableness; it is not shielded from the Commission's inquiry. It is incumbent on CenterPoint, then, to carry its burden to prove that its expenses were "reasonable and necessary."

That CenterPoint must establish that its fuel expenses were reasonable and necessary does not require it to prove that it negotiated the best possible split of savings, but only that its choices fell within a range of options within which an expense is considered reasonable and necessary. It is not charged with knowledge of the distribution of prices in advance. To recover its eligible fuel expenses, CenterPoint must demonstrate that such expenses were reasonable and necessary. *See* 16 Tex. Admin. Code § 25.236(d)(1)(A). Utility expenses cannot be deemed reasonable and necessary unless the utility was prudent in incurring the expenses it seeks to pass on

24

to its rate payers. *See Gulf States Util. Co. v. Public Util. Comm'n*, 841 S.W.2d 459, 466 (Tex. App.—Austin 1992, pet. denied). The "reasonable and necessary" standard thus incorporates a prudence review. *Nucor Steel v. Public Util. Comm'n*, 26 S.W.3d 742, 748 (Tex. App.—Austin 2000, pet. denied). Although we do not conclude, as CenterPoint urges, that a contract that results in savings to ratepayers is prudent as a matter of law, neither do we conclude that the Commission may second-guess rational decision-making aided only by its hindsight analysis. The applicable standard "does not require perfection." *Id.* at 749.

The parties cite to *Texas Utilities Electric Co. v. Public Utility Commission*, 881 S.W.2d 387 (Tex. App.—Austin 1994), *rev'd in part*, 935 S.W.2d 109 (Tex. 1996), in support of their respective arguments. In *Texas Utilities*, the Commission reviewed TXU's fuel contracts with its affiliates and disallowed some of the costs under those contracts. 881 S.W.2d at 412-14. Affiliate contracts, however, are subject to greater scrutiny than other fuel and power purchase contracts. Utilities must show "that the price to the utility is no higher than prices charged by the supplying affiliate to its other affiliates or divisions for the same item or class of items, or to unaffiliated persons or corporations." *Id.* at 412; *see* Tex. Util. Code Ann. § 36.058(c)(2) (West Supp. 2005).

Affiliate transactions are not at issue here. And this higher level of scrutiny for affiliates is not the standard applied to arm's length transactions with third parties such as CPS. The record does not show—and the Commission does not argue—that power and fuel were purchased from third parties when the fuel was not needed, the price was too high compared to other available

contracts for fuel or power, the affiliate rules were violated, or the prices paid included charges that were not related to the price of the power.[9]

In *Texas Utilities*, this Court affirmed the Commission's appropriate disallowance of some of the costs incurred in two third-party contracts because the price was too high. The costs under a gas purchase contract with Amoco were partially disallowed because the price was "unreasonably high given the spot price of gas at the time." *Texas Utils.*, 881 S.W.2d at 414. Similarly, some of the costs under a gas contract with Delhi were disallowed because the utility had misconstrued the contract as requiring it to buy fuel when the purchase was not required and cheaper fuel was readily available. *Id.* at 415. In neither of these instances did the Commission engage in an analysis, as here, as to whether the utility could have negotiated a better price with Amoco or Delhi. Instead, it examined purchase costs in relation to the costs of other alternative fuels available. Thus, it based its decision on evidence of market prices in other contracts, which indicated that the utility had unnecessarily increased customer fuel costs.

Here, the elephant in the room is the Commission's conclusion that the JOA inaccurately allocated costs between CenterPoint and CPS because it included settlement of claims that CPS had against CenterPoint regarding its operation of the STP. Although the Commission's Order contains no findings that give any weight to the fact that the STP claims were settled as part

_____

[9] At an earlier point in the proceedings, CenterPoint settled an issue concerning capacity costs, agreeing to a disallowance of $4.7 million of its purchased power costs as capacity payments. Capacity costs are the costs of scheduling or reserving the right to obtain energy over a steady, recurring, or predictable period of time.

of the agreement, the ALJ concluded in the PFD adopted by the Commission that the 90/10 split concept was inextricably intertwined with the JOA:

> [I]t appears that initially [CenterPoint] recognized that the 90/10 split may have been overstated because the percentages would be reduced from 90/10 to 50/50 after the total estimated benefits exceeded $200 million. This provision supports City of Houston's argument that the motivation for the 90/10 split was to ensure that the JOA would provide the primary source of funding for the $150 million payment that HL&P's shareholders were obligated to pay CPS to settle the STP litigation claims.

The Commission concluded that the amount of total JOA benefits supplied from CPS coal-fired generation, which was the original basis for the 90/10 sharing agreement, was closer to 57%. The Commission found that, of the $191 million in alleged joint benefits, only $109.7 million or 57% could be attributed to CPS's generation. The Commission's reallocation to a 67/33 sharing basis had a basis in the record and was not unreasonable. For its conclusion that the 67/33 split was reasonable, the Commission relied on the testimony of Scott Norwood who testified on behalf of the City of Houston. Norwood based his 67% allocation of benefits to CPS on his determination that only 57% of JOA savings were derived from dispatching CPS's coal units. He concluded that the 67/33 split "more reasonably reflects the contribution of CPS coal-fired [plants] to the estimated joint dispatch benefits." In responding to Norwood's testimony, Mitcham disputed that the actual benefits would not support a 90/10 split. She testified that CenterPoint's reasonable expectations had been "largely" confirmed by actual practice. Using CenterPoint's estimate of the CPS coal benefits, Mitcham concluded that the resulting split was even closer to the 90/10 split—87½%. She concluded, "In either case, however, the difference between HL&P's original expectations and

27

estimates of actual benefits is relatively small, further indicating that HL&P was relying on reasonable expectations when it negotiated the 90/10 split."

The issue is whether CenterPoint carried its burden to demonstrate that its expenses were reasonable and necessary. CenterPoint was not required to show that it could have negotiated a better deal, but it was required to show that the 90/10 split was reasonable under the circumstances. We conclude that CenterPoint did not carry its burden of establishing that the 90/10 split was reasonable. We further conclude that the evidence in the record is consistent with the Commission's conclusion that the split should be "adjusted." The Commission's disregard of the 90/10 savings allocation and its reallocation to a 67/33 sharing of the savings is supported by substantial evidence, and its decision is not arbitrary or capricious. We overrule CenterPoint's first issue.

### Disallowances Related to Short-term Transactions and Block-Power Purchases

The Commission also reduced the amount of savings attributed to the JOA by $46.8 million, composed of $30.6 million for short-term transactions and $16.2 million for block-power purchases. CenterPoint urges that the Commission acted arbitrarily, capriciously, and without substantial evidence in disallowing these amounts. Specifically, CenterPoint contends that the disallowances are inconsistent with the Commission's finding that the benefits attributable to the JOA were $191 million.

#### 1. Short-term Transactions

As to the short-term transactions, the Commission relied upon Scott Norwood's testimony to find that the benefits calculated under the JOA should be reduced by $30.6 million for

short-term energy transactions that were erroneously excluded from the Study S stand-alone scenario. These sales were considered "benefits" of the joint operation, and were thus "shared" under the benefit-sharing arrangement. The Commission found that CenterPoint should have expected these short-term sales of power under independent operations and that CenterPoint had no basis for excluding them from its model. Because excluding these margins from Study S resulted in an overestimation of joint benefits, the Commission disallowed the joint benefit amount.

The evidence presented during the hearing on the merits establishes that CenterPoint, in estimating the costs and benefits of the JOA, used a production cost model to compare the hypothetical productions costs of the two systems under two scenarios, including Study J, which simulated the joint operations of the two systems, and Study S, which simulated the production costs of the two systems operating separately assuming that neither system made short-term energy purchases or sales. Under the JOA, the cost differences between these two scenarios—Study S minus Study J—were defined as benefits of joint operations and attributed entirely to the JOA.

Although both CenterPoint and CPS engaged in separate short-term energy sales, it is undisputed that income from short-term sales was excluded from Study S. Because the JOA benefits calculation did not include short-term transactions (sales or purchases) in Study S and did include them in the Study J scenario, the entire benefits of the transactions were attributed to the JOA with 90% of the benefits assigned to CPS. It is also undisputed that CenterPoint had previously engaged in such short-term energy transactions.

Norwood testified that it was unreasonable for CenterPoint to exclude these transactions from Study S given CenterPoint's historical sales of excess power and that by including

29

them in Study J but not Study S, CenterPoint overstated the benefits derived from the JOA. He concluded that there should be an adjustment to total JOA benefits to remove the estimated margins attributable to the short-term transactions. The Commission reasons that CenterPoint witness Carla Mitcham conceded on cross examination that the JOA excluded these sales revenues despite CenterPoint's expectation they would occur. She testified:

Q: Now since we've already established that you've had some short-term purchases, you're not here and [CenterPoint's] not saying that it didn't have or wouldn't have expected any short-term purchases in a stand-alone dispatch, but simply did not model for that?

A: I think the answer to that is yes. In normal stand-alone operations, there were generally purchases or sales. The JOA did not have that modeled in the calculation, yes.

Q: And I believe we talked yesterday to the extent that those are not in the Model S, and therefore all of the benefits or savings would be attributable to the JOA, you're essentially overstating to some extent the savings from the JOA?

A: If you look at it very narrowly mathematically, yes.

Q: If you look at it the way I just described it, the answer would be yes?

A: Yes.

Mitcham explained that she believed the exclusion was immaterial: "What you get in return for entering into the JOA, if you look at the whole agreement, is all of these thousands of transactions with San Antonio that in my mind produced greater savings than those separate transactions could have produced on their own." CenterPoint urges, then, that the JOA produced savings; the Commission urges that the benefits were overstated.

In its findings of fact, the Commission found that:

30

75: With the onset of competition, CenterPoint had knowledge that the market would become more active and short-term transactions would be common.

76: Before entering into the JOA, in April 1994 through March 1996, [CenterPoint] had significant short-term economy energy sales and purchases.

78: HL&P's assumption not to include short-term energy transactions in Study S was not reasonable given that HL&P had engaged in short-term energy transactions before the JOA.

82: It is also reasonable to adjust [CenterPoint's] benefit calculation by $30.6 million (the amount of estimated benefits of short-term energy transactions HL&P included in the Study J case) to reflect that benefits of short-term energy transactions that were erroneously excluded from the Study S case.

89: Adjusting the benefit split to 67/33 is reasonable, and the adjustment reduces the JOA expenses by a total of $67.1 million. This adjustment incorporates the $46.8 million adjustment recommended for CenterPoint's failure to include short-term energy transactions in the Study S [stand-alone] scenario.

Because in findings of fact 77 and 84, the Commission found benefits attributable to the JOA were $191 million, CenterPoint urges that the existence of these savings are inconsistent with the Commission's other findings.

Again, the issue turns on whether CenterPoint carried its burden to demonstrate that an expense was reasonable and necessary. By Mitcham's testimony, CenterPoint sought to discredit Norwood's testimony as to the definition and calculation of savings under the agreement. Contrary to CenterPoint's assertion that Mitcham's testimony was a mere—and slight—mathematical overstatement of benefits, the disallowance resulted from a conceptual disagreement of the parties over the nature of the savings, a dispute the Commission is well-suited to resolve. We are particularly mindful here that the APA expressly prohibits the re-weighing of the evidence presented

to the Commission, and we may not substitute our judgment for that of the agency on the weight of the evidence on questions presented to the Commission's discretion. Tex. Gov't Code Ann. § 2001.174. The Commission did not abuse its discretion in assigning weight and credibility to Norwood's testimony in light of the record as a whole. We conclude that substantial evidence supports the Commission's decision regarding the short-term transactions and that its decision is not arbitrary or capricious.

Because it began equally sharing the benefits in January 2000, CenterPoint argues that the change cures any harm from treating the transactions as joint benefits. In response to the Commission's assertion that CenterPoint waived this point by raising it for the first time on appeal, CenterPoint argues that this ground is encompassed within its overarching motion for rehearing. The purpose of a motion for rehearing is to provide notice to the agency that the moving party is dissatisfied with its final order and that an appeal will be pursued if the ruling is not altered. The motion should therefore be sufficiently definite to apprise the agency of the error claimed. *Suburban Util. Corp. v. Public Util. Comm'n*, 652 S.W.2d 358, 365 (Tex. 1983) (mere assertion in motion for rehearing that finding unsupported by substantial evidence insufficient to preserve); *Burke v. Central Educ. Agency*, 725 S.W.2d 393, 397 (Tex. App.—Austin 1987, writ ref'd n.r.e.) (mere citation to generic statutory ground of "substantial evidence" or "arbitrary and capricious" insufficient). Although we do not test the requisite specificity by the technical niceties of the pleading and practice rules, the motion must (i) identify and set forth the specific fact finding, legal conclusion or ruling complained of, and (ii) set forth the legal basis asserted by the moving party of the error that has been committed by the agency. *Hill v. Board of Trs. of the Ret. Sys.*, 40 S.W.3d 676, 678 (Tex.

32

App.—Austin 2001, no pet.). Because this ground was not raised in the motion for rehearing, the general motion cannot be construed as encompassing or implying a complaint that the 50/50 change cured any harm. CenterPoint failed to adduce proof that the 50/50 sharing eliminated any overstatement of benefits. Thus, we conclude that this alleged error was not preserved for review.

### 2. Block-Power Purchases

The Commission also found that the JOA overstated the cost of stand-alone operations because it failed to consider the short-term wholesale power purchases CenterPoint would have made in the stand-alone case and reasonably could have foreseen at the time the JOA was adopted. The Commission contends that the JOA failed to take into account that the parties would have engaged in additional third-party purchases in the wholesale market had they not entered into the JOA and that the failure to consider such purchases resulted in an overstatement of JOA benefits. CenterPoint asserts here, too, that the Commission's reasoning is a departure from the required analysis for determining whether an expense is reasonable and necessary.

The Commission based the disallowance on the testimony of Scott Norwood. Norwood testified that the parties' decision to exclude short-term wholesale power purchases from Study S was unrealistic because HL&P had a history of engaging in short-term purchases before entering into the JOA. Thus, the profits or losses from these short-term, third-party energy transactions should have been treated as a stand-alone benefit, that is, a profit or loss each utility could have made on its own. Characterizing CenterPoint's modeling as "unrealistic," Norwood testified:

33

[T]hey've, for years and years and years, sold a lot of energy in the market and purchased a lot of energy in the market when it's economical to do so. And what they've done is reflected those in the joint case with the benefits of those in the joint case and totally ignored them in terms of the short-term transactions in the stand-alone case. . . . [I]t's a very big error that blows these benefit numbers up and makes this . . . in my view . . . unrealistic.

Norwood testified that in the absence of the JOA, CenterPoint would have either produced energy using its own gas generation units or it would have purchased the electricity on the wholesale market. Norwood testified that in some months CenterPoint's own generation units would have been the most cost-effective option. In other months, CenterPoint reasonably could have made money-saving purchases from the wholesale market. These purchases were not considered in CenterPoint's Study S analysis. Norwood calculated the $16.2 million adjustment by assuming that "the energy supplied from CPS coal-fired generation in the joint operations case was replaced by CenterPoint's energy purchases from the ERCOT market at average monthly on-peak prices." The Commission asserts that this calculation resulted in a conservative estimate while CenterPoint asserts that his conclusions are arbitrary and unreasonable. Because block-power purchases must be made in advance and in fixed quantities for set hours over a set number of days and CenterPoint *did* enter into numerous block-power purchases when the price was lower than the anticipated cost of generating the power itself, CenterPoint urges that this does not negate that savings were achieved through the JOA.

It is undisputed that the JOA gave CenterPoint access to the power available from CPS's coal-fired plants and that it achieved savings. It is also undisputed that CenterPoint made purchases on the wholesale market in addition to the energy it received from CPS. The Commission concluded that a disallowance was appropriate because the parties did not include these purchases

34

in calculating Study S costs, the exclusion of which led to an overstatement of the benefit that CenterPoint paid back to CPS.

CenterPoint again asserts that the Commission's analysis is informed by hindsight; the Commission concluded that, because CenterPoint had made such transactions prior to the JOA and due to wholesale deregulation following the PURA amendments in 1995, the parties should have anticipated that third-party purchases would have been available in increasing quantities under stand-alone operations. Thus, the Commission concluded that CenterPoint either was or reasonably should have been aware of the facts and options at the time the agreement was entered into. Although CenterPoint would not have known the precise amount of benefit that it could anticipate by purchasing energy in the ERCOT market, the utility could have foreseen some increase in transactions, and its failure to include these transactions in the stand-alone study was therefore imprudent. We may not substitute our judgment for that of the agency and reweigh the evidence presented to the Commission. We overrule CenterPoint's second and third issues.

## CONCLUSION

Because the Commission's decision is supported by substantial evidence in view of the reliable and probative evidence in the record as a whole, is not arbitrary or capricious, and because we may not substitute our judgment for that of the agency as to the weight of the evidence, we uphold the Commission's disallowances. In a fuel reconciliation proceeding, the utility is seeking to avoid responsibility for fuel costs and pass them on to consumers. Thus, the burden rests on the utility to establish that the utility itself acted reasonably. If the utility fails to carry its burden, it cannot recover costs. The existence of savings alone does not satisfy CenterPoint's burden. The

35

existence of the JOA does not relieve CenterPoint of this burden. We conclude that the Commission did not act arbitrarily and capriciously or without supporting substantial evidence in imposing the disallowances.

We overrule CenterPoint's issues and affirm the judgment of the district court.

_____

Jan P. Patterson, Justice

Before Justices B. A. Smith, Patterson and Puryear

Affirmed

Filed:   June 2, 2006